# UNITED STATES DISTRICT COURT

# DISTRICT OF MAINE

| | |
|---|---|
| JULIE COLLINS,<br><br>              Plaintiff<br><br>v.<br><br>METROPOLITAN LIFE INSURANCE<br>COMPANY and SANMINA-SCI USA, INC.,<br><br>        Defendants | Civil No. 06-76-P-C |

Gene Carter, Senior District Judge

## ORDER GRANTING DEFENDANTS' MOTION FOR
## JUDGMENT ON THE ADMINISTRATIVE RECORD

This is an action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*., brought by Plaintiff Julie Collins for recovery of short term disability ("STD") benefits she alleges were wrongfully denied by Defendants Metropolitan Life Insurance Company ("MetLife") and Sanmina-SCI USA, Inc. ("Sanmina-SCI") under the "Sanmina-SCI Corporation Health and Welfare Benefit Plan."  The matter is before the Court on Defendants' Motion for Judgment on the Administrative Record.  Docket Item No. 26.  Plaintiff Julie Collins has responded to Defendants' Motion and Statement of Material Fact via the summary judgment procedure provided for in Local Rule 56.[1]  The summary judgment format is an appropriate vehicle

---

[1] Along with her Opposition Statement of Material Facts Plaintiff filed the Declaration of Julie Collins, which includes facts not found in the administrative record.  Docket Item No. 33.  Defendants filed a Motion to Strike the Collins Declaration.  Docket Item No. 35.  Since the statements included in the Collins

for presenting the issue to be decided in this case. *Liston v. Unum Corp. Officer Severance Plan*, 330 F.3d 19, 24 (1st Cir.2003) ("In ERISA cases where the decision is to be made by the court based solely on the administrative record, summary judgment is merely a mechanism for tendering the issue.").  Having duly considered the administrative record and the arguments raised by the parties' briefing, the Court concludes that, for the following reasons, Defendants' decision to deny STD benefits is not arbitrary or capricious.

## I. FACTS

After reviewing the statements of material fact of both sides and the responses to each, it is clear that the only relevant factual disputes between the parties center on disagreement regarding attempts by both sides to select and characterize various cited portions of the administrative record at issue in this case.  The Court has resolved these disputes by conducting a first hand review of the administrative record centering on the pages cited by the parties.  In accordance with this procedure, the Court lays out the material facts below as gleaned from the parties' submissions and the Court's review of the administrative record.

Plaintiff Julie Collins began working as a buyer at Sanmina-SCI sometime in June of 2000.  Administrative Record ("AR") at 64-66, 85.  Her job was generally sedentary in nature requiring use of a computer and some walking.  AR at 64-66.  In this position, she performed the purchasing function for a variety of commodities and components which involved some intellectual functioning.  *Id.* at 66 ("Essential Duties & Responsibilities: including but not limited to vendor selection, negotiation, order placement, vendor

---

Declaration are not contained in the administrative record, they cannot properly be considered.  The Court will, therefore, grant Defendants' Motion to Strike.

follow-up, measurement and control of vendor performance, value analysis, evaluation of new materials and processes, expediting and working with other departments."). She was also required to "effectively handle complaints, disputes, and resolve grievances." *Id.* Despite her ongoing treatment for fibromyalgia and depression, Mrs. Collins worked for Sanmina-SCI from June 2000 to January 14, 2005.[2] *Id.* at 85.

Mrs. Collins participated in the Sanmina-SCI Corporation Health and Welfare Benefit Plan ("the Plan"). *Id.* at 113. At all relevant times, the short term disability benefits component of the Plan was funded by a group policy of insurance issued by MetLife. *Id.* at 101, 167. The Plan states that "MetLife in its discretion has authority to interpret the terms, conditions, and provisions of the entire contract. This includes the Group Policy, Certificate and any Amendments." *Id.* at 101. The Plan also provides:

> In carrying out their respective responsibilities under the Plan, the Plan Administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

*Id.* at 171.

Under the Plan, Mrs. Collins was eligible for up to 13-weeks of short term disability benefits if she became "disabled." *Id.* at 114, 122. Mrs. Collins would be considered "disabled" if, "due to sickness, pregnancy or accidental injury," she was "receiving Appropriate Care and Treatment from a Doctor on a continuing basis" and

---

[2] Mrs. Collins was diagnosed with fibromyalgia in the 1980s. AR at 39, 42, 87. Since that time, she has also suffered from depression. AR at 9.

was "unable to earn more than 80% of [her] Predisability Earnings at [her] Own Occupation for any employer in [her] Local Economy." *Id.* at 123.

In December 2004, Mrs. Collins learned that the facility where she worked would be closing in March 2005 and that, as a result, her employment with Sanmina-SCI would end. *Id.* at 83. On January 14, 2005, Mrs. Collins stopped working and made a claim for short term disability benefits. *Id.* at 87. She told MetLife that "up until a year ago she [had] functioned well," but increased pain was now prevented her from working. *Id.* On January 25, 2005, MetLife received two office notes – December 6, 2004 and January 11, 2005 – from Christine Freme M.D., Mrs. Collins' primary care physician. *Id.* at 80-83. On December 6, 2004, Mrs. Collins was seen by Dr. Freme because of headaches and "intermittent" back and leg pain as well as abdominal pain. *Id.* at 83. On January 11, 2005, Mrs. Collins was seen by Dr. Freme for a physical. *Id.* at 74-75, 81-82. At that time, Mrs. Collins reported having "chronic pain," being depressed, and having continuing trouble sleeping despite the increase in sleep medication. *Id.* at 74. Dr. Freme noted that Mrs. Collins "has had several episodes of significant abdominal pain" due to constipation and had problems with her esophagus. *Id.* Mrs. Collins also reported for the first time that she had difficulty sitting and typing "for long periods" of time. *Id.* Mrs. Collins again told Dr. Freme that "her company [was] closing" and wondered "if she should be disabled." *Id.* Dr. Freme stated: "I suspect [she] probably needs disability." *Id.* Under the "Assessment and Plan" section of the medical note it states "due to ongoing pain to apply for disability." *Id.* at 75.

On or about February 5, 2005, Dr. Freme provided MetLife with additional medical records. *Id.* at 70-79. The records included an April 16, 2004, History and

Physical, *id.* at 71-72, an August 19, 2004 office note, *id.* at 79, a September 21, 2004

office note, *id.* at 78, and an October 26, 2004 office note, *id.* at 77.  Specifically, Dr.

Freme's April 16, 2004 "History and Physical" indicates that Mrs. Collins had gone to the

emergency room because of "constipation with abdominal pain." *Id.* at 71-72.  Dr. Freme

reported that Mrs. Collins "has a long history of fibromyalgia and chronic back pain.  She

has been on chronic narcotic therapy for this, although she frequently takes breaks and

does not use narcotics." *Id.*  She also reported that Mrs. Collins "continues to maintain a

job despite her fibromyalgia." *Id.*  On that day, Mrs. Collins reported "good energy

level." *Id.*  Dr. Freme continued Mrs. Collins on OxyContin (a narcotic painkiller) and

amitriptyline (an antidepressant), but discontinued Flexeril (a muscle relaxant). *Id.*

On August 19, 2004, Mrs. Collins was seen by Dr. Freme for foot pain and

"recurrent GI distress" for which she had been hospitalized. *Id.* at 79.  On September 21,

2004, Mrs. Collins was seen by Dr. Freme for foot problem and abdominal pain. *Id.* at

78.  Dr. Freme noted that Mrs. Collins was taking "Tylenol #3" (acetaminophen and

codeine) for headaches. *Id.*  On October 26, 2004, Mrs. Collins was seen by Linda

Morneault for back pain, rectal pain, and insomnia. *Id.* at 77.  At that time, Mrs. Collins

reported that "she stopped OxyContin on her own." *Id.*  On Mrs. Collins report that her

sleeping medication amitriptyline had been decreased, Ms. Morneault increased the

dosage. *Id.*  Mrs. Collins was directed to follow-up as needed. *Id.*

In support of Mrs. Collins' disability claim, Dr. Freme also provided MetLife a

one-paragraph letter dated January 31, 2005, wherein she states:

> I am writing on behalf of Julie Collins.  I believe she warrants
> disability because of several ongoing problems.  She has difficulty
> with chronic joint pain in her hands, low back, and in her legs.  She

> has difficulty if she stoops over, moves, or has to sit for an
> extended period.  If she has to type for an extended period, her
> hands become sore.  She has trouble sleeping.  In addition, she has
> had recurrent problems with her digestive system and she has been
> in the emergency room for these problems.  She suffers from
> fibromyalgia and depression.  She has had recurrent chronic
> complaints of pain in her back and anxiety.

*Id.* at 73.

On February 9, 2005, a nurse consultant from MetLife discussed with Mrs. Collins the lack of "objective medical" evidence supporting her claim that she was disabled from her work.  *Id.* at 91.  The next day, Mrs. Collins saw Dr. Freme for the purpose of assessing her physical functional ability.  *Id.* at 69.  Dr. Freme stated that "although [Mrs. Collins] can walk down the stairs, it is very difficult for her to get up. . . . She has to hold onto the railing and help lift herself.  She has difficulty flexing at the hip, and it is difficult for her to lift her legs.  . . . .  She can only lift her legs a couple of inches off the table against a small resistance.  . . . .  She became short of breath with walking. She had difficulty walking the length of the hallway in our building because of shortness of breath and stiffness."  *Id.* at 69.  Dr. Freme also stated: "[S]he can extend her arms in front of her forward but she cannot keep them there for very long.  She can clasp her hands over her head but she also cannot support her arms above her head for extended periods of time.  She has decreased grasp in the hands secondary to stiffness and pain." *Id.*  Dr. Freme states that Mrs. Collins "will have difficulty with repetitive motion of the hands and wrists secondary to pain" and that "[d]oing office work would therefore be very difficult for her."  *Id.* at 69.

Thereafter, MetLife nurse consultants reviewed the medical records and, on February 22, 2005, spoke with Dr. Freme.  *Id.* at 92-93.  Dr. Freme reported that Mrs.

Collins' pain had increased and that her depression had worsened. *Id.* at 93. However, Dr. Freme acknowledged that she had not referred Mrs. Collins for any psychiatric treatment. *Id.* The MetLife nurse consultants concluded that the record did not support a finding that Mrs. Collins was physically unable to perform her job. *Id.* at 90-94. By letter dated February 28, 2005, MetLife advised Mrs. Collins that it was unable to approve her claim for short term disability benefits. *Id.* at 60-61. Specifically, MetLife stated:

> Your claim was referred to a clinical specialist for review. The medical information reviewed included office visit notes from Dr. Christine Freme dated December 6, 2004, January 11, 2005 and February 10, 2005. The clinical specialist also contacted your physician by phone on January 25, 2005 and February 22, 2005. The medical documentation received and reviewed does not substantiate your inability to perform the essential job functions as a buyer. The records indicate that you complained of back and leg pain along with depression. There were no objective clinical findings of a severity that would have precluded you from working at your regular job. Office visit notes from December 6, 2004 indicate palpation of the low back laterally, and above the buttocks indicates there is no deformity and no marked pain on palpation. The office visit note from January 11, 2005 indicates your physical exam was negative. The attending physician has not advised a treatment plan or estimated return to work date. The complaints of depression were reviewed with a separate clinical specialist. Medical does not support a psychiatric condition that will prevent you from working.
>
> Since the information does not substantiate impairments in you performing the substantial and material acts of [your] own occupation as a Buyer, your claim is denied.

*Id.* at 60-61.

By letter dated August 10, 2005, Mrs. Collins appealed the denial of her claim for short term disability benefits. *Id.* at 36. In support of her appeal, Mrs. Collins submitted an April 4, 2005, report from Dr. John Pier and a May 19, 2005 "Team Evaluation

Report" from U.S. HealthWorks (along with certain documents Mrs. Collins states she
had to complete for U.S. HealthWorks).  *Id.* at 39-44.  In his April 4, 2005 report, Dr.
Pier notes that Mrs. Collins "was diagnosed with fibromyalgia 18 years ago."  *Id.* at 39.
Mrs. Collins told Dr. Pier that "her pain has increased over the last 6 to 12 months" and
her "employment became more and more difficult."  *Id*.  Dr. Pier states that the
"fibromyalgia type pain" Mrs. Collins has had for 17 years makes it "difficult for her to
perform her job from a physical standpoint."  *Id.* at 40.  He also suggests that her
underlying depression would make it difficult for her to perform her job, but states that he
"would defer to psychiatry [as to] whether this is in fact disabling."  *Id*.  Dr. Pier
recommended increasing Mrs. Collins' Zoloft at that time to help address her depression.
*Id.* at 40.

The May 19, 2005 "Team Evaluation Report" from U.S. HealthWorks (from a
physical therapist, an occupational therapist, and a psychologist) indicates that Mrs.
Collins was not a candidate for physical or occupational therapy because of depression.
*Id.* at 44.  The clinicians noted that, even though she was on antidepressant therapy, "[o]n
clinical exam [Mrs. Collins] reported moderate to significant depressive
symptomatology."  *Id.* at 43.  Mrs. Collins was also referred for Pain Management
services at U.S. HealthWorks.  *Id.* at 42.  A one-hour physical therapy evaluation was
performed on May 19, 2005.  The physical therapist determined that Mrs. Collins
"[f]unctional tolerances include: Walking 15 to 30 minutes.  Standing: 30 minutes.
Sitting: 1 hour using heat or ice.  Stairs: Nonreciprocal and with the use of a railing."  *Id.*
at 42.  A one-hour occupational therapy evaluation was also performed on May 19, 2005
at U.S. HealthWorks.  *Id.* at 43.   Numerous difficulties were noted.  *Id*  Most notable

8

was her problem sleeping ("she reports averaging 4 hours a night, which she describes as non-restful").  *Id.*

As part of the appeal process, MetLife asked R. Kevin Smith D.O., a physician board certified in preventive and occupational medicine and consultant for MetLife, to review Mrs. Collins' medical records.  *Id.* at 11-19.  In his report, dated September 8, 2005, Dr. Smith summarized Mrs. Collins' medical records and related materials, and concluded as follows:

> The medical records available for review do not indicate objective clinical evidence or functional impairments or treatment intensity of a severity that would support her inability to work at her own occupation on a full-time basis as of 01/14/05.  Although she has numerous tender points on examination, records do not indicate range of motion or neuromuscular impairments consistent with her intractable pain and inability to work at her own occupation. Treatment intensity is also not consistent with her alleged severe impairments.  The records do not indicate functional limitations to preclude her from working at her own occupation as of 01/14/05.

*Id.* at 12-13.  In short, Dr. Smith did "not find objective medical evidence or impairments of a severity that would preclude her from working at her own occupation from 01/14/05 as it relates to her medical/physical condition."  *Id.* at 13.

On September 6, 2005, Lee H. Becker, M.D., a board certified psychiatrist and physician consultant for MetLife, issued his five-page report.  *Id.* at 30-34.  Dr. Becker reviewed and summarized the available medical records, and concluded as follows:

> The documentation available for review does not support such significant, global psychiatric impairments, along with objective findings, to preclude occupational functioning.  The initial information around the time in question from the Primary Care Physician did not indicate specific and significant depressive symptoms targeted for treatment nor are significant mental status abnormalities documented.  There was no documentation that a referral to a Psychiatrist or other Mental Health Clinician occurred. It appeared that initially pain issues were the primary focus of

treatment and that progress notes from the PCP around the time in
question indicated that her company was closing and as such
it could be that work related issues were impacting.  It appears that
minimal mental health treatment occurred from the time the
Claimant went off work to the times of the additional pain
evaluations in April and May of 2005.  The additional information
submitted from the Pain Evaluation Clinicians reported various self
reported/subjective pain, mood and concentration issues but again,
this documentation did not indicate significant abnormalities in
thought processing, attention, memory, concentration, speech, nor
extreme abnormalities in judgment or impulse control and
therefore the mental status examination did not contain significant
objective findings.  No documentation from a Mental Health
Clinician was submitted for review.

*Id.* at 32-33.  Dr. Becker also noted that Mrs. Collins "was not involved in intensive

individual or group psychotherapy to address a significant depression around the time she

went off work.  The Primary Care Physician did not refer the Claimant to Mental Health

Clinicians around the time in question."  *Id.* at 33.

On September 19, 2005, Mrs. Collins submitted a "psychiatric evaluation"

from Dr. Peter Kelly dated August 22, 2005.  *Id.* at 8-9.  Therein, Dr. Kelly noted that

Mrs. Collins "was free from depression and free from psychiatric symptoms in general

until the onset of fibromyalgia eighteen (18) years ago."  *Id.* at 9.  As regards her

"psychiatric condition," Mrs. Collins reported that "her mood is very depressed, her

energy is poor, her level of interest and initiative are low, and her activity is limited by

her lack of energy.  Her sleep is very poor, as she is awakened repeatedly by pain."  *Id*.

On the basis of his clinical findings, Dr. Kelly opined that Mrs. Collins was "totally

disabled from work."  *Id.*  MetLife submitted Dr. Kelly's report to Dr. Becker.  *Id.* at 7,

97.  Thereafter, Dr. Becker issued an addendum to his earlier report stating that Dr.

Kelly's report did not change his opinion because it primarily referred to self-reported

symptoms and did not provide details about any mental status exam or report on any

10

specific mental status findings. *Id.* at 7, 98.  Therefore, Dr. Becker reaffirmed his opinion

that the record did not support that Mrs. Collins had a psychiatric impairment that would

prevent her from performing her job. *Id.*

By letter dated September 29, 2005, MetLife informed Mrs. Collins that it had

completed its review of her claim for short term disability benefits, and that the "original

denial determination was upheld upon appeal review." *Id.* at 4.  In its letter, MetLife

stated as follows:

> You claim total disability from your occupation as a Buyer
> following your last day worked, January 14, 2005.  Your Short
> Term Disability claim was denied as the medical in file did not
> support that you were disabled under your Plan.  This review was
> completed due to your request for an appeal review.
>
> We reviewed all of the documentation that was submitted for your
> file …. To assist in our appeal review, your entire medical file was
> reviewed on September 8, 2005 by an Independent Physician
> Consultant who is Board Certified Preventive Medicine,
> Occupational Medicine.  He reviewed your file from a physical
> perspective.  He concluded that the medical records as they relate
> to your physical/medical conditions do not indicate objective
> clinical evidence, functional impairments, or treatment intensity of
> a severity that would support your inability to work at your own
> occupation.  Although you have numerous tender points on
> examination, records do not indicate range of motion or
> neuromuscular impairments consistent with intractable pain and an
> inability to perform your own occupation.  He noted that you failed
> to respond to any type of treatment. Yet, the treatment intensity is
> also not consistent with your alleged severe impairments.
>
> He noted that the medical records show that you have received
> appropriate supportive care as you were referred to Pain
> Management and a PM&R specialist which are appropriate and
> consistent with the usual medical standards.  However, he also
> noted that all of your providers have recommended psychiatric
> care but it does not appear to have been achieved.  He notes that it
> is unclear why you are not under psychiatric care following these
> recommendations.  The Independent Physician Consultant
> determined that he could not find objective medical evidence of
> impairments of such a severity that would preclude you from

working at your own occupation as of your last day worked, January 14, 2005 as it relates to your medical/physical condition. He recommended a psychiatric review to address aspects of impairments from depression and anxiety disorder.

Your file was also reviewed on September 8, 2005 by an Independent Physician Consultant who is a Board Certified Psychiatrist who reviewed your file from a psychiatric perspective. He determined that the documentation available for review does not support such significant global psychiatric impairments, along with objective findings, to preclude occupational functioning.

He noted that the initial information around the time in question from the Primary Care Physician (PCP) did not indicate specific depressive symptoms targeted for treatment and no significant mental status abnormalities were documented.  There was no documentation that a referral to a psychiatrist or other mental health clinical [sic] occurred.  It appeared that initially pain issues were a primary focus of treatment and the progress notes from the PCP around the time in question indicated that your company was closing and as such it could be that work related issues were impacting.

The file documents minimal mental health treatment from the time you went off work to the times of the additional pain evaluations in April and May of 2005.  The additional information from the pain clinic reported various self reported/subjective pain, mood and concentration issues but again, this documentation did not indicate significant abnormalities in thought processing, attention, memory, concentration, speech, judgment or impulse control.  Therefore, there were no objective findings to support an inability to perform your own occupation.  No documentation from a Mental Health Clinician was submitted for review.

The Independent Physician Consultant specializing in psychiatry concluded that you did not appear to be receiving appropriate care and treatment for an allegedly severely impairing psychiatric condition.  Although pain and mood issues were noted, you were not involved in intensive individual or group psychotherapy to address a significant depression around the time you went off work.  The information submitted shows that the pain evaluation recommended a mental health follow-up; however, there is no documentation for review immediately following that recommendation.  Consequently, the Independent Physician Consultant determined that the documentation available for review does not support such significant global psychiatric impairments,

along with objective findings, to preclude occupational
functioning.

After the Psychiatric Independent Medical Evaluation was
completed, we received additional medical from Dr. Peter Kelly.
The file was returned to the Independent Medical Consultant who
reviewed the additional medical information and he concluded that
it did not significantly change the prior report.  He noted that the
information provided listed self-reported symptoms but did not
provide a detailed mental status examination or specific mental
status findings and therefore no objective findings to support any
functional impairments that would prevent you from performing
your job duties.  Although the note indicated treatment with
psychotherapy and antidepressants, the specific psychotropic
medications were not provided and the history and type of
psychotherapy was not indicated.

Since a review of the file did not support findings from a physical
or psychiatric perspective that would prevent you from performing
your job duties, the original claim determination was appropriate
and your claim will remain denied.

*Id*. at 4-6.  Thereafter, Mrs. Collins filed the instant action.

## II. DISCUSSION

### A. Standard of Review

The parties disagree about what the proper standard of review is in this case.

Defendants contend that because the Plan gives the Plan Administrator or Plan Fiduciary

discretionary authority to determine eligibility for benefits or to construe the terms of the

Plan, then the decision to deny benefits is reviewed using the arbitrary and capricious

standard.  *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Wright v.

R.R. Donnelley & Sons Co. Group Benefits Plan*, 402 F.3d 67, 74 (1st Cir. 2005).

Plaintiff does not challenge the language of the Plan or that statement of the law, rather

she asserts that because MetLife both determines eligibility for benefits and is responsible

for paying the benefits provided under the Plan, there exists an inherent conflict of

interest and MetLife's decision should be subject to closer scrutiny.  The First Circuit has directly addressed that issue and stated that "no automatic conflict of interest arises to elevate the standard of review where . . . 'a finding of eligibility means that the insurer will have to pay benefits out of its own pocket.'"  *Tsoulas v. Liberty Life Assurance Co. of Boston*, 454 F.3d 69, 76 (1st Cir. 2006) (quoting *Pari-Fasano v. ITT Hartford Life and Acc. Ins. Co.*, 230 F.3d 415, 418 (1st Cir.2000)).  Under those circumstances, the Court of Appeals for the First Circuit has directed that "courts should apply 'the arbitrary and capricious principle, with special emphasis on reasonableness, but with the burden on the claimant to show that the [insurer's] decision was improperly motivated.'"  *Id.* (citation and internal quotation marks omitted).  Plaintiff's citation to other cases where MetLife has been found to have committed errors in reviewing a plaintiff's claim, do not convince this Court that a less deferential review of this claim is warranted.  Plaintiff has provided no evidentiary basis for her conflict of interest assertion or analysis of this argument. There must be support in the record that the potential conflict of interest actually affected MetLife's decision in this case.  There being no evidence of actual conflict of interest, the Court will employ the arbitrary and capricious standard.

Under the arbitrary and capricious standard of review, the Court's role is limited to making sure the insurer's eligibility determination was not unreasonable in light of the information available to it.  *See Pari-Fasano*, 230 F.3d at 419.  Stated differently, when it is possible, based on the record evidence, to offer a reasoned explanation for the benefits determination, that determination is not arbitrary or capricious.

**B. Defendants Determination Supported in the Record**

It is undisputed in the record that Mrs. Collins has suffered from fibromyalgia and depression since the 1980s.  These conditions have caused ongoing symptoms for her, including the time she was employed at Sanmina-SCI.  Mrs. Collins contends that her condition had worsened starting in early 2004 and continued to worsen until she could no longer work on January 14, 2005.

During the nine months leading up to January 2005, the medical records indicate that in addition to the longstanding fibromyalgia and depression, Mrs. Collins experienced some gastrointestinal problems, foot pain, headaches, rectal pain, and insomnia.  Dr. Freme, Mrs. Collins treating physician, saw her on December 6, 2004, because of headaches and "intermittent" back and leg pain as well as abdominal pain.  *Id.* at 83.  She also reported that the increase in stress and anxiety associated with the impending closure of Sanmina-SCI was likely aggravating Mrs. Collins back pain.  *Id.* The December 6, 2004 note from Dr. Freme does not state that her fibromyalgia had worsened or that it prevented her from doing her job.

Up until January 11, 2005, nothing in the medical records suggests that Mrs. Collins was having trouble working because of fibromyalgia or depression, that her fibromyalgia or depression had worsened, or that she had developed new symptoms from the fibromyalgia or depression.  On January 11, 2005, Mrs. Collins reported having "chronic pain," being depressed, and having continuing trouble sleeping despite the increase in sleep medication.  *Id.* at 74.  Dr. Freme noted that Mrs. Collins "has had several episodes of significant abdominal pain" due to constipation and had problems with her esophagus.  *Id*.  Mrs. Collins also reported for the first time that she had

difficulty sitting and typing "for long periods" of time. *Id*. Mrs. Collins again told Dr. Freme that "her company [was] closing" and wondered "if she should be disabled." *Id*. To this inquiry Dr. Freme stated: "I suspect [she] probably needs disability." *Id*. Mrs. Collins then applied for short term disability benefits under the Plan. In a separate letter to MetLife, Dr. Freme explained what medical problems Mrs. Collins suffers from and opined that she was disabled, but failed to specify how these problems prevented her from working as a buyer at Sanmina-SCI. *Id*. at 73.

The foundation for the determination of whether the challenged conclusion of MetLife can be sustained is the significant medical evidence bearing on the existence of work disability as of January 14, 2005. Here, the analysis of this evidence in the administrative record is conducted against the background fact that the Plaintiff first brought forth her claim of disability only after she learned of the impending termination of her employment because of the closing of the business in which she worked. The medical professionals have referred, in passing, to this fact without ascribing to it any specific meaning, effect, or weight in assessing the medical evidence in the record; the only exception being the querulous suggestion by Dr. Becker, the psychiatrist, that "it could be that work-related issues were impacting." *Id*. at 33. He does not opine that the fact had any causative force in bringing about the claim of disability nor does he even intimate the nature and effect of the "impact" which he suggests may have occurred with respect to the medical aspects of the record. In this record, the timing of the claimed assertion in its juxtaposition with Plaintiff's knowledge of her impending termination does not appear to have been considered as part of the medical evidence bearing on the

existence of disability by the medical professionals or MetLife and, therefore, shall not be considered by the Court.

The evidentiary points of significant medical weight to be drawn from the administrative record are the following.

1.      Dr. Freme's statement that Mrs. Collins, "will have difficulties with repetitive motions of the hands and wrists secondary to pain" and that, "[d]oing office work would therefore be very difficult for her." *Id.* at 69.  She does not, however, relate these conditions to any impediment preventing Plaintiff from performing her job as a buyer.

2.      U.S. HealthWorks "Team Evaluation Report" of  May 19, 2005 indicating that Mrs. Collins was not a candidate for physical or occupational therapy because of depression. *Id.* at 42-44.

3.      The physical therapy evaluation of May 19, 2005 in which it was determined that Plaintiff's "functional tolerances include:  Walking:  15-30 minutes. Standing:  30 minutes.   Sitting:  1 hour using heat or ice.  Stairs: nonreciprocal and with the use of a railing." *Id.* at 42.

4.      The U.S. HealthWorks Occupational Therapy Evaluation of the same date noting numerous difficulties, principally Plaintiff's problems sleeping ("she reports averaging 4 hours a night, which she describes as non-restful"). *Id.* at 43.

5.      Dr. Kelly's opinion that as of August 22, 2005 that Mrs. Collins was "totally disabled from working" *id.* at 9, he does not opine directly, however, that Plaintiff was disabled on January 14, 2005, the operative date in question.  Nor does he explain how and why he believes her depression totally disables her in August of 2005.

6.      Dr. Smith's conclusion that he did "not find objective medical evidence or impairments of a severity that would preclude her from working at her own occupation from 01/14/05 as it relates to her medical/physical condition." *Id.* at 13.

7.      Dr. Becker's conclusion that "[t]he documentation available for review does not support such significant, global psychiatric impairments, along with objective findings, to preclude occupational functioning." *Id.* at 32.  He notes that "the initial information around the time in question from the primary care physician did not indicate specific and significant depressive symptoms targeted for treatment nor are significant mental status abnormalities documented." *Id.* at 32-33.  He also notes as significant that Plaintiff "was not involved in intensive individual or group psychotherapy to address a significant depression around the time she went off work.  The Primary Care Physician did not refer Claimant to Mental Health Clinicians around the time in question." *Id.* at 33.

The Court's thorough examination of the administrative record reflects that, although it is possible to draw competing inferences from the medical data in the record as to the extent of Plaintiff's ability to work on January 14, 2005, this potential conflict is insufficient to satisfy Plaintiff's burden in this case.  The record reflects that Plaintiff had been able to perform her job at Sanmina-SCI for several years despite her history of fibromyalgia and depression.  During the nine months leading up to January 14, Mrs. Collins medical records do not indicate a significant change in her medical condition. Moreover, the medical records do not indicate how the new, and/or increased symptoms, she claims to have experienced prevented her from performing her job.  It is significant

that the first physical functionality assessment was not performed until after Dr. Freme

had already determined that Mrs. Collins was "disabled."  *Id.* at 69.

In reaching its disability determination, MetLife is not required to rely on the

opinions of the claimant's treating physician over other medical opinions.  The Supreme

Court has held that under ERISA, "courts have no warrant to require administrators

automatically to accord special weight to the opinions of the claimant's physician; nor

may courts impose on plan administrators a discrete burden of explanation when they

credit reliable evidence that conflicts with the treating physician's evaluation." *Black &*

*Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).   Although no physician or

medical consultant associated with MetLife ever physically examined Mrs. Collins,

MetLife's physicians reviewed Plaintiff's medical records and concluded that the medical

evidence failed to demonstrate that Plaintiff's medical condition rendered her unable to

work at her occupation.  Both of MetLife's consulting physicians indicated that

Plaintiff's medical treatment was not at the intensity level they would expect for an

individual who had experienced a substantial deterioration in her longstanding medical

conditions.  AR at 5, 12, 32-33.

This record, taken as a whole, does not provide a basis for this Court to conclude

that MetLife's denial of Plaintiff's claim was arbitrary or capricious.

### C. MetLife's Denial Not Vague and Confusing

Mrs. Collins contends that MetLife's explanation of its decision was vague and

confusing and, thus, in violation of the regulations governing notice of benefits

determinations under ERISA.  *See* 29 C.F.R. § 2560.503-1(j).  Specifically, she

challenges three aspects of the benefits denial: (1) MetLife did not indicate how the lack

of treatment for depression would affect her physical functioning; (2) MetLife's statement that "objective evidence" or "objective medical evidence" was lacking is vague and confusing; and (3) MetLife's statement that there was insufficient evidence of a "treatment intensity of a severity that would support [her] inability to work at [her] occupation" is indecipherable.  With respect to all of these complaints, the Court finds that MetLife provided Mrs. Collins all the information that was necessary during the claims process.  The burden is not on MetLife to show or explain how a claimant with a given condition could be disabled; rather the burden is on Mrs. Collins to show that she is disabled.  AR at 155-56 (an employee making a claim for short term disability benefits under the Plan must provide "documented proof" of her disability).  Through MetLife's correspondence with Mrs. Collins, she was on notice that MetLife determined that the medical evidence on file was not sufficient to show that her medical conditions precluded her from performing her occupation.

Mrs. Collins also asserts that her claim was improperly denied because MetLife demanded "objective evidence" of her medical condition, which is not required by the Plan.  This argument is misleading because MetLife's denial was based, not on the absence of evidence that she suffers from these medical conditions, but on MetLife's conclusion that the medical records provided insufficient objective evidence that Mrs. Collins was unable to work as a buyer as of January 14, 2005 as a result of her medical conditions.[3]  Thus, the Court concludes that MetLife did not ask Mrs. Collins to provide something that was not required by the Plan.

---

[3] Plaintiff has filed a Motion to Strike this argument suggesting that Defendants' Reply raises new arguments regarding the reasons for the benefits denial.  Plaintiff's Motion to Strike Arguments Raised in Defendants' Reply Memorandum or, in the alternative, Motion for Leave to File Surreply (Docket Item Nos. 37 and 38) at 2.  Specifically, Plaintiff asserts that Defendants argue for the first time in their reply

## III. CONCLUSION

Having reviewed the entire record under the deferential standard of review that governs this matter, the Court cannot find error in MetLife's decision to deny Plaintiff's application for STD benefits.  Accordingly, the Court **ORDERS** that Defendants' Motion for Judgment on the Administrative Record be, and it is hereby, **GRANTED.**  It is further **ORDERED** that Defendants' Motion to Strike the Declaration of Julie Collins be, and it is hereby, **GRANTED,** and Plaintiff's Motion to Strike Defendants' Reply Memorandum and Plaintiff's Motion for Leave to File Surreply be, and they are hereby, **DENIED**.


/s/ Gene Carter_____
Gene Carter
Senior District Court Judge

Dated at Portland, Maine this 1st day of March, 2007.

---

memorandum that "what they were seeking was 'objective evidence of an inability to work as a result of [Mrs. Collins'] medical condition.'"  *Id.* (quoting Defendants' Reply Memoranda).  The Court finds that MetLife's denial letters make clear that the reason for the denial of benefits is that Plaintiff failed to support her claim with evidence of impairment that prevents her from working.  *Id.* at 5 ("objective evidence of impairments of such a severity that would preclude [Mrs. Collins] from working").  The Court will, therefore, deny Plaintiff's Motion to Strike and Plaintiff's Motion to File a Surreply.